**WESTERN MACHINERY COMPANY, a
Corporation, Appellant,**

v.

**NORTHWESTERN IMPROVEMENT
COMPANY, a corporation, Appellee.**

**No. 15238.**

United States Court of Appeals
Ninth Circuit.

Nov. 14, 1957.

Rehearing Denied Feb. 5, 1958.

Shapro & Rothschild, Arthur P. Shapro, San Francisco, Cal., Karr, Tuttle & Campbell, Carl G. Koch, Coleman P. Hall, Seattle, Wash., for appellant.

Dean H. Eastman, Roger J. Crosby, Seattle, Wash., for appellee.

Before BONE, FEE and HAMLEY, Circuit Judges.

JAMES ALGER FEE, Circuit Judge.

In an action on a written contract for sale and purchase of machinery,

the trial court held that the sole signatory thereto as buyer was a surety, who was released because the court found that another, unnamed in the instrument, was principal and that time had been extended to the latter without the consent of the surety. The first question is whether the signer bound itself personally by contract as purchaser. The answer depends upon the legal interpretation of a writing under the law of the State of Washington.

Western Machinery Company, through J. Stanley Huckaba, its sales representative, duly authorized to make contracts binding upon the company for sale of machinery, entered into a series of negotiations with Earl R. McMillan for the sale of a coal washing plant. The latter was the only official of Northwestern Improvement Company representing it in the State of Washington. He was, as its Manager of Coal Operations, authorized to accept an offer and sign a written contract for the purchase of coal washing machinery.

The following contract was entered into dated February 20, 1952:

**WEMCO EQUIPMENT DIVISION**

**QUOTATION**

San Francisco File Copy

RECEIVED FEB 25 1952

| DELIVER TO | SEEN BY | DATE |
|---|---|---|

WESTERN MACHINERY COMPANY • 760 FOLSOM STREET • SAN FRANCISCO 7, CALIFORNIA

QUOTATION FOR: NORTHWESTERN IMPROVEMENT COMPANY

ADDRESS: Bellingham, Washington

SUBJECT: ___ DATE Feb 20 1952

| ITEM No. | QUAN-TITY | DESCRIPTION | TOTAL WEIGHT IN POUNDS-APPROX. | | PRICE F.O.B. SACRAMENTO | |
|---|---|---|---|---|---|---|
| | | | EACH | TOTAL | EACH | TOTAL |
| 1 | 1 | For 80 Tons/Hr HMS Feed Only 3-C MODIFIED Wemco Mobile Mill A PREFABRICATED HEAVY MEDIA Separation Plant, complete with all pulp & water piping, all electric motors, wiring & controls, with machines as listed below BUT LESS Feed Preparation & Product disposal Equipment F.O.B. Factories | 87420 | 56860 | | |

Equipment List
8" diam by 6' long Drum Separator
5' wide by 16' long A.C. conero Product Screen
36" Magnetic Separator
5" Demagnetizing Coil
24" x 17" Densifier
5" Medium Return Pump
12" Cleaned Media Pump
14' x 4'-7" Medium Thickener
Electrical Control Panel, Screening Machine, Demagnetizing Coils, Magnetizing Blocks, etc

NORTHWESTERN IMPROVEMENT COMPANY
Earl R. McMillan
MANAGER OF COAL OPERATIONS

TOTAL

This Quotation will remain in effect for ___ days from date hereof; but the prices in this proposal are subject to the seller's prices in effect at the time of shipment, but shall not be more than 20% above the prices quoted herein. ALL PRICES F.O.B. SACRAMENTO, CALIF. UNLESS OTHERWISE MENTIONED AND ARE SUBJECT TO CHANGE WITHOUT NOTICE. SEE CONTINGENCY FACTORS ON REVERSE SIDE.

By J S Huckaba

PAGE 2

## WEMCO EQUIPMENT DIVISION
# QUOTATION
### San Francisco File Copy

**WESTERN MACHINERY COMPANY • 760 FOLSOM STREET • SAN FRANCISCO 7, CALIFORNIA**

QUOTATION FOR ~~Baltimore Coal Mines Co, Inc~~ Northwestern Improvement Co CUSTOMER'S REF._____

ADDRESS Bellingham, Wn WEMCO'S REF._____

SUBJECT._____ DATE._____

| ITEM No. | QUAN-TITY | DESCRIPTION | TOTAL WEIGHT IN POUNDS APPROX. | | PRICE F.O.B. SACRAMENTO | |
|---|---|---|---|---|---|---|
| | | | EACH | TOTAL | EACH | TOTAL |
| 2 | 1 | Only Bucket Elevator for Cleanup & Spillage Return Magnetite to Circuit. Including Motor and Electrical Controls F.O.B Sacramento, Calif | 2800# | | | 2050.00 |
| | | FOR SCREENING 80 tons/hr — 20% thru 3/16 opening — | | | | |
| 3 | 1 | Only 5' x 12' Single Deck A.C. Rpl Flow Screen with Stainless Steel 3/16" Cloth & Including 7½ H.P. Motor and V-Belt Drive Less Motor Controls - F.O.B Milwaukee Wis | 4200# | | | 3180.00 |
| | | FOR DEWATERING SCREEN - UNDERSIZE - 3/16" at 20 tons Hr | | | | |
| 4 | 1 | Only 36" x 19'-3' Long Coal Spiral with Double Pitch Spiral, Medium Flared Tank & 3 H.P. Motor, Less Motor Controls F.O.B Sacramento | 6000# | | | 3640.00 |
| | | FOR DEWATERING CLEANED COAL FROM TABLES - To Discharge on Cleaned Coal Belt | | | | |
| 5 | 1 | Only 36" x 19'-3 Coal Spiral as Item 4 | 6000# | | | 3640.00 |
| | | | TOTAL | | | |

NORTHWESTERN IMPROVEMENT COMPANY

MANAGER OF COAL OPERATIONS

This Quotation will remain in effect for _____ days from date hereof; but the prices in this proposal are subject to the seller's prices in effect at the time of shipment, but shall not be more than 20% above the prices quoted herein. ALL PRICES F.O.B. SACRAMENTO, CALIF., UNLESS OTHERWISE MENTIONED AND ARE SUBJECT TO CHANGE WITHOUT NOTICE. SEE CONTINGENCY FACTORS ON REVERSE SIDE.

BY._____

On February 25, 1952, McMillan wrote the following letter to Western, which was received on March 10, 1952:

**NORTHWESTERN IMPROVEMENT COMPANY**
(SUBSIDIARY OF NORTHERN PACIFIC RAILWAY COMPANY)
1012 SMITH TOWER
SEATTLE 4, WASHINGTON

PLAINTIFF EXHIBIT 2

RECEIVED MAR 10 1952 ADMITTED JUN 13 195:

February 25, 1952

EARL R. McMILLAN
MANAGER OF COAL OPERATIONS

Western Machinery Company
808 Division Street
Spokane, Washington

Attention: Mr. J. Stanley Huckaba

Gentlemen:

 Confirming our discussions and agreement reached in this office last Friday, February 22nd, I signed an order with you, dated February 20th, for the following equipment:

| | |
|---|---|
| One only 3-C Modified WEMCO Mobile Mill . . . . . | $56,860.00 |
| One only 5 x 12" Single Deck A. C. Ripl Flow Screen . . . . . . . . . . . . . . | 3,180.00 |
| One only 36 x 19'-3 Long Coal Spiral . . . . . . . | 3,640.00 |
| Total | $63,680.00 |

 As you know, this equipment is being bought for the Bellingham Coal Mines Company at Bellingham, Washington, for which Northwestern Improvement Company is the operating manager, and as such has been duly authorized by the former to purchase this equipment. This arrangement, of course, makes unnecessary any investigation on your part as to the financial responsibility of the Bellingham Coal Mines Company, which as you know is a newly organized corporation. I might add, however, for your information, that the latter company is adequately financed and fully responsible for any commitments they may make at this time.

 Please see to it that the routing of all equipment shipped on our orders to Bellingham gives maximum proportion of movement via Northern Pacific.

 It is our understanding that delivery of all of this equipment will be completed as promptly as possible, which is now estimated will be within sixty to ninety days from date.

Yours very truly,

Earl R. McMillan
Manager of Coal Operations

ERM:gs
cc - Mr. Jas. S. Ramage

---

Western Machinery Company furnished the machinery in accordance with this contract, shipping by Northern Pacific, and thereafter billed Northwestern for the machinery consistently during the installation of the machinery in the plant of Bellingham Coal Mines as will hereafter be discussed. Thereafter, when Bellingham had gone into bankruptcy, Western insisted upon payment by Northwestern and, upon refusal, brought action.

The first document, consisting of the written offer of Western signed by Huckaba and the acceptance by endorsement of the name of Northwestern and the signature of McMillan, was under commercial usage a complete contract in writing. Upon its face, the instrument demonstrates that Western may have intended to make an offer to Bellingham, but finally struck the name and address of the latter from the offer. In its present form, Bellingham is not mentioned. There is no question the machinery was

installed in the coal mine belonging to it. There is, however, no reference of any kind to Bellingham in the instrument. The contract is one between Western and Northwestern, which are the only signatories. This Court construes the first document as a bilateral contract for the sale of goods. The agreement is between these two corporations only. If it were to be viewed as a unilateral contract, the act requested by Northwestern was performed by Western. In either event, there was sufficient consideration. Western sustained a detriment either by promising to furnish the machinery or by installing the coal washer where Northwestern directed. Benefit to the latter was not an essential to the existence of a valid contract.

█ It is established doctrine that the signatures are an essential part of a written contract. If the signature is unexplained in the contract itself or by qualifying words connected with the signature, the party is personally bound thereon. This rule has been uniformly adopted by the courts of the State of Washington.[1]

██ In this case, Western objected to certain evidence offered by Northwestern, on the ground that the contract would be altered or contradicted thereby. This objection should have been sustained.[2] No principle of law is more firmly established than this. A written instrument cannot be changed, explained or set aside by parol. The names of Northwestern and Western were essential parts of the instrument. If these had not appeared thereon, there would have been no written contract. Therefore, the evidence offered to the effect that Northwestern signed for Bellingham was inadmissible.

█ One who signs a written contract for sale is not permitted to show that he did not intend to be bound personally. He cannot prove that he signed his own name as an agent for a third party or as surety for another. It is clear that this is a necessary consequence of the rule above stated that the signatures are vital to the contract. Further, if the signatures and position of the parties can be explained, there is no longer a rule protecting written contracts, upon which the business of the world progresses.

█ The oral opinion of the trial court indicates, as noted above, that the document which has been discussed was the contract. The formal findings however, referred to a letter written by Northwestern as a part thereof. This Court holds that this letter was no part of the contract. There is a request therein that shipment be made on "orders" of Northwestern by Northern Pacific, to which Western acceded. On the face of this letter there is no contradiction of the terms of the contract, but a confirmation of the fact that Northwestern was the buyer. This communication further contains the positive declaration that, because it was the buyer and had financial responsibility, Western need not examine the credit standing of Bellingham.

The law of the State of Washington is clearly defined upon this point. In a situ-

1. Casualty Company of America v. Beattie, 75 Wash. 166, 134 P. 817, 136 P. 1153; Norbom Engineering Co. v. A. H. Cox & Co., 120 Wash. 675, 208 P. 87; Karatofski v. Hampton, 135 Wash. 139, 237 P. 117.

2. In Washington the rule against admission is very strict. "There being no ambiguity in the instrument, the court committed error in admitting parol testimony to show that the persons signing this instrument intended to sign in some other capacity than that in which they did sign." Costello v. Bridges, 81 Wash. 192, 204, 142 P. 687, 691, L.R.A.1915A, 853. Smith v. Johnson, 2 Wash.2d 351, 359, 98 P.2d 312; Washington Fish & Oyster Co. v. G. P. Halferty & Co., 44 Wash.2d 646, 658–659, 269 P.2d 806; Karatofski v. Hampton, 135 Wash. 139, 141–142, 237 P. 17. It is held in Washington that this is a doctrine of substantive law. Reeder v. Western Gas & Power Company, 42 Wash.2d 542, 552–553, 256 P.2d 825. If not, the rule of evidentiary exclusion is firmly applied in the federal courts. Zell v. American Seating Co., 2 Cir., 138 F.2d 641, 643.

ation which contains a written contract for sale and a subsequent claim of agency for a third party by the person who signed the written contract as buyer, the latter was held liable. Smith v. Johnson, 2 Wash.2d 351, 98 P.2d 312. An earlier case in which the facts are almost identical with those in the case at bar was decided upon the same principles. Norbom Engineering Co. v. A. H. Cox & Co., 120 Wash. 675, 208 P. 87. The doctrine is firmly embedded in the decisions of the courts of Washington.[3] The signatures of buyer and seller to a contract for sale are an integral part thereof and cannot be explained. This rule is applied even though all parties knew of the agency of the buyer for a third party.[4]

■ The trial court indicated that in some mysterious way Northwestern became surety for Bellingham, as the purchaser. Although the subsequent letter states Northwestern was acting as duly authorized agent for Bellingham, nowhere are words used which indicate an intention to answer for the debt or default of another. Had Northwestern and

Bellingham both signed the contract for sale and an ambiguity had occurred therein concerning the respective status, a different situation might have arisen.[5] However, the Washington Supreme Court has held the relation of the parties signing as purchasers could not be explained.

■ But the idea that the status of the sole signatory to a contract, as promisor, can be shown to be a surety for a third person who has not signed the instrument has no place in the law of sales. This doctrine does apply to an accommodation maker who alone signs a promissory note,[6] and has its roots in the law merchant. Although there is dicta to the contrary,[7] the doctrine is not applied outside this limited field, where it is now generally crystallized in a statute.[8] The best exposition of the reason for the application of the contrary rule in ordinary contract cases is found in a decision in which the facts are in many respects similar to those in the case at bar. Pursuant to a written service agreement signed by defendant, plaintiff furnished

3. This controlling principle appears in numerous decisions of the Supreme Court of Washington. Norbom Engineering Co. v. A. H. Cox & Co., 120 Wash. 675, 208 P. 87; Karatofski v. Hampton, 135 Wash. 139, 237 P. 117; Costello v. Bridges, 81 Wash. 192, 142 P. 687, L.R.A. 1915A, 853; Wright v. Seattle Grocery Co., 105 Wash. 383, 177 P. 818; Farmers State Bank of Newport v. Lamon, 132 Wash. 369, 231 P. 952, 42 A.L.R. 1072; Moore v. Webster, 191 Wash. 394, 71 P.2d 369. Cases from other jurisdictions: Schriner v. Dickinson, 20 S.D. 433, 107 N.W. 536; Higgins v. Senior, 151 Eng.Rep. 1278, 8 M & W 834. See also Ford v. Williams, 21 How. 287, 62 U.S. 287, 289, 16 L.Ed. 36; Barbre v. Goodale, 28 Or. 465, 472, 38 P. 67, 43 P. 378; Rathmann v. Schwanz, 170 Wis. 459, 465, 175 N.W. 812.

4. "Where an agent enters into a contract in his own name, even though his principal is disclosed, he is personally liable upon the contract." Norbom Engineering Co. v. A. H. Cox & Co., supra, 120 Wash. at page 682, 208 P. at page 89.

5. Karatofski v. Hampton, 135 Wash. 139, 237 P. 117, holds that the written contract of sale cannot be explained. Zarbell v. Mantas, 32 Wash.2d 920, 923,

204 P.2d 203, cites Karatofski, but, having discovered an ambiguity as to the status of the signing buyers, permits one to be held as a surety.

6. Hoffman v. Habighorst, 38 Or. 261, 63 P. 610, 53 L.R.A. 908. The same rule obtains when one of two or more co-makers seeks to show that, as between the original parties, he had, without consideration, signed the note as a surety or accommodation maker only. Harned v. Harned, 270 Ky. 735, 110 S.W.2d 674; Flippen v. Lindsay, 221 N.C. 30, 18 S.E. 2d 824.

7. Zarbell v. Mantas, 32 Wash.2d 920, 922, 204 P.2d 203; Amalgamated Gold Mines v. Ridgely, 100 Wash. 99, 170 P. 355. Howell v. War Finance Corporation, 9 Cir., 71 F.2d 237, is not in point. Hoffman v. Habighorst, supra, involved a strict promissory note situation. See Note 6.

8. The Uniform Negotiable Instruments Act, § 29, defines an "accommodation party" as "one who has signed the instrument * * * without receiving value therefor, and for the purpose of lending his name to some other person." Section 25 of the same Act defines "value" as "any consideration sufficient to support a simple contract."

live steam to a building owned by defendant and to his tenants therein. It was urged upon appeal the evidence should have been received that defendant signed as an accommodation party and that there was no consideration for the contract to him. The court held the written contract controlled, saying:

"The steam service furnished by plaintiff to defendant's tenants was the consideration for defendant's promise to pay for the same. It was not necessary that the defendant should have received anything of value or any benefit for his promise. The rule is elementary that there is a sufficient consideration for a promise if there is any benefit to the promisor or any loss or detriment to the promisee. It is not necessary that a benefit should accrue to the person making the promise. It is sufficient that something valuable flows from the person to whom the promise is made, or that he suffer some prejudice or inconvenience. What defendant really sought to do in proffering the excluded testimony was to vary or contradict the terms of the written contract.

"Defendant invokes the elementary rule that in an action on a promissory note brought by the payee against the maker, it may be shown by parol that the maker is an accommodation party. That rule has no application here. What the maker really shows by parol under that rule is that there is no consideration for the note. There is and can be no consideration for the note so long as it remains in the hands of the payee. The consideration arises only upon the transfer of the note for value. In such case the consideration is the value which passes from the transferee to the payee. The maker receives nothing, but he must nevertheless answer to the transferee in accordance with the terms of the note.

"It follows that in this case the proffered testimony was properly excluded * * *." Union Electric Co. of Missouri v. Fashion Square Building Co., Mo.App., 165 S.W.2d 284, 286.

The trial court adopted the fallacy pointed out in the case just quoted. It held Northwestern had received no consideration for its promise to pay. It has already been mentioned that there was sufficient consideration for the contract, as Western and Northwestern were the only parties thereto. The promise of Western to sell was sufficient consideration for the promise of Northwestern to pay.[9] The circumstance that all the practical benefit of a contract passed to a third person, to the knowledge of both parties to the contract, has no legal consequence.[10] In daily life, this is an ordinary occurrence. A purchaser of goods directs a seller to deliver them to a third party: the transaction between the purchaser and the third party may be a gift or there may be business relations between them which dictate the direction. But the contract for sale is enforceable between the parties thereto notwithstanding.

 The trial court was in error as a matter of law in concluding that Northwestern was a surety for Bellingham.[11]

9. Restatement, Contracts, §§ 75(2), 77, 81. See Allen v. Rose Park Pharmacy, 120 Utah 608, 613, 237 P.2d 823; Moers v. Moers, 229 N.Y. 294, 301, 128 N.E. 202, 14 A.L.R. 225.

10. "It is well established that a consideration may consist as well in a detriment to the person to whom a promise is made as in a benefit to the other party." Franklin v. Fischer, 34 Wash.2d 342, 346, 208 P.2d 902, 904. Plastray Corporation v. Cole, 324 Mich. 433, 440, 37 N.W. 2d 162, 8 A.L.R.2d 1199; Osborne v. Curtis, 209 App.Div. 100, 204 N.Y.S. 304, 306, affirmed 239 N.Y. 616, 147 N.E. 219. See also Simmons v. California Institute of Technology, 34 Cal.2d 264, 272, 209 P.2d 581; Industrial Bank and Trust Co. v. Hesselberg, 195 S.W.2d 470, 474; Clay v. Chesapeake & Potomac Telephone Co., 87 U.S.App.D.C. 284, 184 F.2d 995, 996; Knox v. First Security Bank of Utah, 10 Cir., 196 F.2d 112, 118.

11. The case of Karatofski v. Hampton, 135 Wash. 139, 237 P. 117, is directly in point as to the claim a signer cannot be

The court was correct in the conclusion that the Statute of Frauds presented no bar to validity, since the instrument was in writing and signed by the party sought to be charged.

 Western charged Northwestern on its books for all the machinery delivered to the plant of Bellingham. It billed Northwestern directly for the items during the course of delivery and installation. On or about August 23, 1952, at the insistent urging of McMillan, a payment and a promissory note by Bellingham were accepted by Western. Thereupon, the books of Western carried Bellingham on the note accounts as the maker thereof. A memorandum on this sheet referred to the original account, where the charges had been made to Northwestern. Western at no time abandoned its claim that Northwestern was the debtor.

On this evidence the trial court found correctly that there was no novation whereby Bellingham assumed the debt of Northwestern, and Western accepted the transfer of liability with the consent of all three parties. There was no novation. There was no contention that the promissory note was accepted by Western as payment of the original obligation of Northwestern. The trial court found that Western extended time to Bellingham by taking the promissory note, and this without the consent of Northwestern. These findings are clearly erroneous. McMillan was not only the sole official of Northwestern directly involved in all the negotiations and the contract with Western, but he was also a member of the Board of Directors of Bellingham. The evidence shows that Northwestern was interested in maintaining the credit rating of Bellingham. A chattel mortgage on the articles sold was denied, and it was arranged that a payment and a promissory note be given. McMillan voted for these as a member of the Board

of Directors of Bellingham. He could not refuse to consent, as managing official of Northwestern, to what he did as a board member of Bellingham. On the record, Northwestern was not only interested, but was pressing that a promissory note be taken, since it recognized its own obligation to pay immediately and if the money could be gotten from Bellingham, Northwestern profited. Because of these factors, the findings that time was extended without the consent of Northwestern are clearly erroneous and are set aside. As it has already been held as a matter of law that Northwestern was not a surety, such findings are immaterial. But Northwestern cannot escape liability under the evidence, whatever legal theory be adopted.[12]

Affirmed in part, reversed in part, remanded with direction to enter judgment for plaintiff and against defendant in the full amount due on the contract.

---

shown to be a surety. It is still cited as authority by the Washington court. First National Bank v. Geske & Co., 85 Wash. 477, 148 P. 593, involves the same point in a different situation.

12. Neither in the trial court nor in this Court was the wealth of cases in the controlling jurisdiction, the State of Washington, cited on the pertinent points.